1 **MACDONALD | FERNANDEZ LLP**
Reno F.R. Fernandez III (SBN 251934)
914 Thirteenth Street
Modesto, CA 95354
(209) 521-8100
reno@macfern.com

Attorneys for Plaintiff,
Penelope C. Bethel

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PENELOPE C. BETHEL, Individually and for the Estate of ROY P. BETHEL,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT LYNN CASHMAN, an individual; HUMBLE ENERGY, INC., a Nevada corporation; HALLMARK VENTURE GROUP, INC., a Nevada corporation; SERVICE TEAM INC., a Nevada corporation; and SPORTSTIX INC.,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, FINANCIAL ELDER ABUSE AND RELATED CLAIMS**<br><br>Jury Trial Demanded |

**COMES NOW** Plaintiff Penelope C. Bethel, individually and for the estate of her late husband, namely Roy P. Bethel, and alleges as follows:

**JURISDICTION AND VENUE**

1.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"). The claims alleged herein arise under Sections 10(b) and 20A of the Exchange Act and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC").

2.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b) and 1337. A substantial part of the events and omissions giving rise to the claims

alleged herein occurred in this District. All or many of the acts giving rise to the violations complained of herein took place in this District. Each offer and each purchase described below took place in this District. All defendants conducted business in this District at all relevant times.

3. In connection with the acts alleged herein, all defendants, whether directly or indirectly, used the means and instrumentalities of interstate commerce, including mail, telephones, facsimile machines, email, the Internet, facilities of the SEC and facilities of one or more national security exchanges in connection with the purchase of securities.

**PARTIES**

4. Plaintiff is an individual and is now, and at all times mentioned in this complaint was, a resident of Stanislaus County, California. At the time of the earliest purchase alleged below, Plaintiff was 69 years of age. Plaintiff is now 75 years of age.

5. Plaintiff is the personal representative for the estate of her late husband, namely Roy P. Bethel. Plaintiff is the successor in interest to substantially all of Mr. Bethel's estate and interests.

6. At the time of the earliest purchase alleged below, Mr. Bethel was 83 years of age. Mr. Bethel died on December 29, 2010, at the age of 84.

*Defendant Cashman*

7. Defendant Robert Lynn Cashman is an individual who resides, and at all times mentioned in this complaint resided, in Orange County, California. Among other places, Defendant Cashman does, and at all times mentioned in this complaint did, conduct significant business within this district.

8. At all times relevant, Defendant Cashman had the power to control and actively controlled each other Defendant and each agent mentioned below in connection with each transaction, occurrence and omission alleged below. In particular, Defendant Cashman had direct and supervisory involvement in the management and the day-to-day operations of the other Defendants, and he

exercised such supervision, involvement and management in connection with each transaction, occurrence and omission alleged below. Defendant Cashman directly and indirectly induced such transactions, acts and omissions. In doing so, Defendant Cashman did not act in good faith.

9. At the time of each purchase alleged below, Defendant Cashman purported to hold the following positions with the following business entities, among others: (a) Director, Treasurer and Chief Financial Officer of Humble Energy, Inc.; (b) Chairman, Secretary, Chief Executive Officer, President, Chief Financial Officer and Chief Accounting Officer of Defendant Service Team Inc.; (c) Vice President, Secretary, Chief Financial Officer, Chief Administrative Officer and Director of Sport Stix Inc.; and (d) Chief Executive Officer, President, Chief Financial Officer, Secretary and Promoter of Defendant Hallmark Venture Group, Inc.

10. Plaintiff Bethel is informed and believes that several additional individuals engaged in conduct or omissions supporting or related to the causes of action alleged herein or are otherwise liable therefor. Upon discovery of their identities, this Complaint will be promptly amended to add them.

*Corporate Defendants*

11. Defendant Humble Energy, Inc. (OTC Ticker: HUML) is now, and at all times mentioned in this complaint was, a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Orange County, California. Among other places, Defendant Humble Energy does, and at all times mentioned in this complaint did, conduct significant business within this district.

12. Defendant Hallmark Venture Group, Inc. (OTC Ticker: HLLK) is now, and at all times mentioned in this complaint was, a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Orange County, California. Among other places, Defendant Humble Energy does, and at all times mentioned in this complaint did, conduct significant business within this district.

13. Defendant Service Team Inc. (OTC Ticker: SVTE) is now, and at all times

mentioned in this complaint was, a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Orange County, California. Among other places, Defendant Sports Team does, and at all times mentioned in this complaint did, conduct significant business within this district.

14. Defendant Sport Stix Inc. is now, a and at all times mentioned in this complaint was, a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in the County of Irvine, California. Among other places, Defendant Sports Team does, and at all times mentioned in this complaint did, conduct significant business within this district.

15. Plaintiff Bethel is informed and believes that several additional business entities engaged in conduct or omissions supporting or related to the causes of action alleged herein or are otherwise liable therefor. Upon discovery of their identities, this Complaint will be promptly amended to add them.

**GENERAL ALLEGATIONS**

16. Plaintiff Bethel was swindled in a classic stock "pump and dump" scheme. In particular, Plaintiff Bethel was swindled in a fraudulent scheme to sell her stocks for far more than their value based upon false representations:

   a. That the stocks were worth substantially more than their actual value;

   b. That the stocks would soon sell for more than their purchase price, with certainty;

   c. That the stocks were freely and publicly traded, whereas in fact the volume of trade was very low and conducted in significant part by insiders;

   d. That the businesses involved had legitimate, profitable operations and were not false fronts for a fraudulent scheme; and

   e. Other specific misrepresentations as alleged below.

17. The Defendants sold stock to Plaintiff Bethel for arbitrarily inflated prices bearing no substantial relationship to their value (for example, flat prices of 25 cents or 50 cents per share), all

4

the while falsely representing to her that she was purchasing such stocks for less than their market value.

18. In fact, the stocks were nearly valueless when sold to Plaintiff Bethel. Insiders traded the stocks at artificially high prices in order to create a false appearance of value. The underlying businesses may have had some nominal operations but were used as false fronts for the fraudulent scheme described herein. The scheme was carried out using various specific misrepresentations, as alleged below.

19. In carrying out their scheme, the Defendants took undue advantage of Mr. and Mrs. Bethel' advanced age.

## FIRST CAUSE OF ACTION
**(Rule 10b-5 Violations as to All Defendants)**

20. Plaintiff incorporates and realleges each of the foregoing allegations as though set forth herein in full.

21. As alleged herein, in connection with the sale of securities, Defendants made a series of materially false and misleading statements which they knew were false and materially misleading at the time they were made, and omitted material information necessary to make their statements not materially false and misleading at the time.

22. In conjunction with the business entities on whose behalf they were acting at the time, the following Defendants made the following untrue statements to Plaintiff.

*Misrepresentations Regarding Humble Energy*

23. In a letter dated April 12, 2010, addressed to an associate of Defendant Cashman but sent to and delivered to Plaintiff Bethel in or about that time as an inducement, Defendant Cashman stated in pertinent part:

Humble Energy, Inc. is principally owned and managed by David Kane....

***

5

> This is his fourth company that he has started in the oil and gas industry. He has been involved in huge successes. His last company, Humble Petroleum, Inc., started out as a fifteen cent share and was sold to Exxon for $4.65 per share.
>
> ***
>
> The oil and gas fields in the Little Rock area are now old enough so the original owners are dying and Mr. Kane is able to purchase the royalty rights for pennies on the dollar. As a rule of thumb, money invested to purchase royalty rights earns about 25% per year on its investment. By purchasing the royalty rights there is no risk of drilling a dry hole and all maintenance of the wells is paid for by the owner of the wells. We simply receive checks in the mail. Before we buy a royalty, we audit the past payments and the geological projections for production in the future so we are pretty sure of our future earnings. Combine this with the potential gain in the stock value, you can then see why I was anxious to be involved in this company.
>
> ***
>
> There is certainly no doubt that the gas will be selling for more than $10.00 [per one thousand cubic feet] in the next year or so which would increase the earnings of Humble Energy, Inc. by four times and even a conservative ten times multiple would push it well over $2.00.
>
> ***
>
> When this is accomplished [when the company is listed on the OTC Bulletin Board] we will support the stock price at $1.00 initially and anticipate it to be trading between $2.00 and $3.00 within 12 months after it's listed on the Bulletin Board.

24. In fact, Humble Petroleum was not sold to Exxon but eventually merged into Defendant Humble Energy. An unrelated entity with a similar name, namely Humble Oil & Refining Company, was founded in 1911 and eventually became Exxon. Defendant Cashman used such similarity to confuse Defendant Bethel.

25. When the statements were made, it was false that: "There is certainly no doubt that the gas will be selling for more than $10.00 [per one thousand cubic feet] in the next year…."

26. It was false that Humble Energy's earnings would increase by four times over the next year. It was false that Humble Energy's stock would be worth well over $2.00 per share in the next year.

27. It was false that Humble Energy's stock would be trading between $2.00 and $3.00 per share within 12 months after listing it with the OTC Bulletin Board. It was false that Defendant

6

Cashman anticipated that the stock would so trade.

28. Defendant Cashman used Defendant Humble Energy as a false front to carry out the fraudulent scheme alleged herein.

29. In reliance upon the aforesaid misrepresentations, Plaintiff Bethel purchased shares of stock in Defendant Humble Energy, as more particularly alleged below.

*Misrepresentations Regarding Hallmark and Service Team*

30. In an undated document entitled "Fact Sheet," delivered to Plaintiff Bethel in or about October, 2010, which Plaintiff is informed and believes was authored and delivered by Defendant Cashman, it was stated in pertinent part:

> HVG, Inc. [Defendant Hallmark Venture Group] is a manufacturer of refrigerated and dry freight truck bodies. The company also manufactures a wide variety of specialized truck bodies and modifications to van bodies. The company operates a full service manufacturing facility to design, fabricate, and repair truck bodies.
>
> ***
>
> The company has historically had sales of approximately four million dollars a year and has been profitable for more than 10 years.
>
> ***
>
> Service Team Inc. is a national repair facility for small consumer appliances.
>
> ***
>
> There is really no limit to the business available in the United States. Service Team Inc.'s growth will be limited only by its ability to recruit and train competent technicians.

31. In fact, at the time said statements were made, Defendant Hallmark was not a manufacturer of refrigerated and dry freight truck bodies. Defendant Hallmark holds and held itself out to be a private equity fund.

32. Likewise, Defendant Service Team was not a national repair facility for small consumer appliances.

33. When the statements were made, it was false that Defendant Hallmark historically had

sales of approximately $4 million per year.

34. It was false that Defendant Hallmark had been profitable for more than 10 years.

35. It was false that: "There is really no limit to the business available in the United States. Service Team Inc.'s growth will be limited only by its ability to recruit and train competent technicians."

36. Defendant Cashman used Defendants Hallmark and Service Team as false fronts to carry out the fraudulent scheme alleged herein.

37. In reliance upon the aforesaid misrepresentations, Plaintiff Bethel purchased shares of stock in Defendants Hallmark and Service Team, as more particularly alleged below.

***Misrepresentations Regarding Service Team and Sport Stix***

38. In an undated letter sent to and received by Plaintiff Bethel in or about August, 2012, an agent for Defendant Cashman, acting on his behalf, stated in pertinent part:

> You are going to buy 30,000 shares of Service Team at 75 cents per share. Your shares will be free trading and liquid. Within 2 weeks or so you will actually be able to sell shares into the public marketplace.
>
> The minimum price the stock will sell for will be 1 dollar per share. (We expect at least a 2 dollar per share price by Nov. or Dec.)
>
> ***
>
> According to our Attorney, Sportstick will trade in 60 to 90 days from now and we expect an IPO price Of 1 dollar per share plus.
>
> We have an outstanding note to you for 20,000 dollars plus interest. We will honor that by Sept. 10, 2012.
>
> I will personally guarantee the principal amount within that timeframe.

39. In fact, at the time said statements were made, shares of stock in Service Team were worth significantly less than 75 cents per share.

40. When the statements were made, it was false that: "Your shares will be free trading and liquid." Among other circumstances, shares of stock in Defendant Service Team were not free

trading or liquid because the volume of trading so far was very low and was conducted in significant part by insiders. Any non-insider trades were at artificially-inflated values because they were made in reliance upon the aforesaid misrepresentations or other misrepresentations pertaining to the value of the stock.

41. It was false that Plaintiff Bethel would be able to sell the stock for a minimum of $1.00 per share within two weeks.

42. It was false that the stock would be worth at least $2.00 per share by November or December of that year.

43. It was false that shares of stock in Defendant Sport Stix would sell for $1.00 per share or more at an initial public offering to be conducted within 60 to 90 days.

44. It was false that Defendant Service Team, Defendant Sport Stix or the author of the letter intended to repay the aforesaid loan by September 10, 2012.

45. Defendant Cashman used Defendants Service Team and Sport Stix as false fronts to carry out the fraudulent scheme alleged herein.

46. In reliance upon the aforesaid misrepresentations, Plaintiff Bethel purchased shares of stock in Defendants Service Team and Sport Stix, as more particularly alleged below.

*Misrepresentations Regarding Sport Stix*

47. In an undated summary sent to and received by Plaintiff Bethel in or about August, 2012, an agent for Defendant Cashman, acting on his behalf, stated in pertinent part: "Big box sporting goods retailers – Academy Sports the nation's largest sporting goods retailer has agreed to carry Sport Stix[.]"

48. In fact, at the time said statements were made, Academy Sports was not the nation's largest sporting goods retailer. Walmart and Dick's Sporting Goods were and are, in fact, the nation's largest and second largest sporting goods retailers, respectively.

49. Upon information and believe, Academy Sports had not agreed to carry Sport Stix.

50. In reliance upon such misrepresentations, Plaintiff Bethel purchased shares of stock in Defendants Sport Stix, as more particularly alleged below.

***Misrepresentations Regarding Service Team, Sport Stix and Hallmark***

51. Defendant Cashman and two agents of his, in an undated letter sent to and received by Plaintiff Bethel in or about July of 2013, jointly stated in pertinent part:

> We have done a lot of good things lately for our clients and we will continue to do so in the future.
>
> Things like replacing non-performing stock with active, value packed, free trading stock that in a worse-case scenario is trading at a minimum of 20% above purchase price.
>
> We have even allowed a select few of our clients to continue to acquire our most recent offering… Sport Stix stock at 10 cents per share as opposed to 25 cents or the actual initial offering price of 50 center per share which will happen without fail within the next 30 days or so.
>
> \*\*\*
>
> We are poised to trade Service Team in volume and the only hiccup is the opinion letter from our attorney which will be received by weeks end.  After that, it's full steam ahead with Service Team.
>
> Also, we are going to go back to bringing the accounting for Hallmark Venture Group to current status so we can start trading it back at above a dollar as well.
>
> \*\*\*
>
> If [certain conditions obtain], it will be a win-win for all of us.  (Our stock won't drop to 25 cents a share for God knows how long and we will have enough money to get Hallmark rockin and rolling without having to sell any new Hallmark shares.  It's a double win because your value in Hallmark increased and your value in Service Team doesn't go down.)

52. In fact, the authors of the letter had not done lately done a lot of good things for their clients but instead swindled such clients in the fraudulent scheme described herein.

53. At the time the aforesaid statements were made, it was false that the authors had replaced non-performing stock with "active, value packed, free trading stock…."  In fact, any such

stock was relatively valueless, its trading volume was very low, and a significant portion of the trades were conducted by insiders. Any non-insider trades were at artificially-inflated values because they were made in reliance upon the aforesaid misrepresentations or other misrepresentations pertaining to the value of the stock.

54. It was false that, in a worse-case scenario, such stock was trading at a minimum of 20% above purchase price.

55. It was false that Defendant Sport Stix's stock was worth 10 cents, 25 cents or 50 cents at the time. In fact, such stock was worth significantly less.

56. It was false that Defendant Sport Stix's stock would trade for 50 cents per share "without fail" at an initial public offering to be conducted within approximately 30 days.

57. It was false that the authors were "poised to trade Service Team in volume…."

58. It was false that the only problem with Defendant Service Team's stock was an opinion letter from its attorney to be received by week's end. It was false that it would be "full steam ahead" following receipt of the letter.

59. It was false that an accounting for Defendant Hallmark would cause its stock to trade for more than $1.00.

60. It was false that any circumstances likely to obtain would be a "win-win for all of us."

61. It was false that: "Our stock won't drop to 25 cents a share for God knows how long…."

62. It was false that the authors would soon "have enough money to get Hallmark rockin and rolling without having to sell any new Hallmark shares."

63. It was false that the value of Plaintiff Bethel's shares of stock in Defendant Hallmark had increased.

64. It was false that the value of Plaintiff Bethel's shares of stock in Defendant Service Team do not go down.

11

65. The authors of the letter each used Defendants Sport Stix, Service Team and Hallmark as false fronts to carry out the fraudulent scheme alleged herein.

66. In reliance upon the aforesaid misrepresentations, Plaintiff Bethel purchased shares of stock in Defendants Service Team, Sport Stix and Hallmark, as more particularly alleged below.

*Misrepresentations Regarding Service Team and Hallmark*

67. In an undated letter sent to and received by Plaintiff Bethel in or about August of 2013, an agent for Defendant Cashman, acting on his behalf, stated in pertinent part:

> O.K.  Here you go.  You are going to purchase 14,000 shares of Service Team stock at 50 cents per share.
>
> For helping us out, I am going personally give you 10,000 shares of Hallmark Venture Group which you will receive after we get this straightened out.
>
> ***
>
> Thank you for working with us.  We would be in big trouble if we didn't have you.  I will make sure to give you Dr. Nunn's number so you can straighten him out!

68. In fact, Defendant Service Team's stock was worth significantly less than 50 cents per share at the time the letter was authored and delivered.

69. At that time, shares of stock in Defendant Hallmark were valueless or nearly valueless.

70. It was false that Plaintiff Bethel's purchase of stock would save Defendant Service Team from "big trouble."

71. It was false that a dispute with a Dr. Nunn was primary cause of Defendant Service Team's trouble.  It was false that "straighten[ing] him out" would significantly improve the value of Defendant Service Team's stock.

72. In reliance upon the aforesaid misrepresentations, Plaintiff Bethel purchased shares of stock in Defendants Service Team and Hallmark, as more particularly alleged below.

*Misrepresentations Regarding Service Team and Hallmark*

73. In an undated letter send to and received by Plaintiff Bethel in or about July of 2014, an agent for Defendant Cashman, acting on his behalf, stated in pertinent part:

12

> This is a great deal. You will have a chance to make up some ground in your portfolio in a positive way.
>
> You are buying 125,000 shares of Service Team stock at 15 cents per share. It is currently trading at 45 cents per share on the open market and there would also be commissions to pay.
>
> Penny, please make out a check for $18,750 dollars to Hallmark Venture Group.
>
> ***
>
> You already have a lot of shares that you should be able to sell in the 1 dollar plus range, shortly. The idea is to replace the expensive shares with the 15 cents shares and make a decent profit. Thanks.

74. In fact, none of the transactions contemplated in the letter was "a great deal." It was false that Plaintiff Bethel would "make up some ground" in her portfolio in a positive way by engaging in the transactions contemplated in the letter.

75. Defendant Service Team was insolvent at the time said statements were made in that its liabilities significantly exceeded its assets. Moreover, Defendant Service Team's income was insufficient to pay current liabilities.

76. For the fiscal year ending August 31, 2014, Defendant Service team earned only $0.006 per share, and each share carried a deficit (negative value) of $0.008 per share.

77. By September 2, 2015, Defendant Service Team's stock would trade at $0.02 per share. From December 15, 2015, to the date hereof, Defendant Service Team's stock would trade between $0.00 and $0.01 per share.

78. At the time the aforesaid statements were made, it was false that shares of stock in Defendant Service Team were trading at 45 cents per share on the open market. In fact, the volume of such trading was very low, and a significant portion of such trading was conducted by insiders. Any non-insider trades were at artificially-inflated values because they were made in reliance upon the aforesaid misrepresentations or other misrepresentations pertaining to the value of the stock.

79. It was false that Plaintiff Bethel would shortly be able to sell such stock for $1.00 or more per share. It was false that Plaintiff Bethel would soon make a decent profit. Defendant Cashman

13

had no such expectations at the time he made such statements.

80. Defendant Cashman used Defendants Service Team and Hallmark as false fronts to carry out the fraudulent scheme alleged herein.

81. In reliance upon the aforesaid misrepresentations, Plaintiff Bethel purchased shares of stock in Defendants Service Team and Hallmark, as more particularly alleged below.

82. Each of the Defendants made additional oral misrepresentations substantially similar to each of the aforesaid statements.

*Elements*

83. Each of the aforesaid statements was false when made. Each of the aforesaid statements was material in that it was important to the transaction contemplated thereby, and Plaintiff Bethel would not have undertaken any such transaction had she known any of the aforesaid statements was false.

84. The Defendants, and each of them, omitted the following facts necessary under the circumstances to keep the aforesaid statements from being misleading:

   a. Each of the aforesaid stocks was worth significantly less than the price at which they were offered to Plaintiff Bethel. Each of said stocks was worth significantly less than the value the aforesaid Defendants represented such stocks to be worth.

   b. The businesses underlying each of the aforesaid stocks was valueless or worth significantly less than as represented to Plaintiff Bethel.

   c. The statements made in the aforesaid correspondences were untrue.

   d. Each of the aforesaid corporate defendants was a false front for the fraudulent scheme described herein.

85. Each of the aforesaid omissions was material in that it was important to the transactions described in this cause of action, and Plaintiff Bethel would not have undertaken any such transaction had she known such facts.

14

86. Each of the aforesaid statements and omissions was made in connection with the purchase of securities in that it was made in order to induce Plaintiff to purchase, it was made in the course and context of Plaintiff's purchase of, and it was made to conceal the true value of the following securities:

    a. On or about June 7, 2010, Plaintiff Bethel purchased 200,000 shares of stock in Defendant Humble Energy for $20,000.00, which is equal to 10 cents per share;

    b. On or about September 21, 2010, Plaintiff Bethel purchased 50,000 shares of stock in Defendant Hallmark for $25,000.00, which is equal to 50 cents per share;

    c. On December 8, 2010, Plaintiff Bethel purchased 100,000 shares of stock in Universal Golf Technologies, Inc., predecessor in interest to Sport Stix, for $25,000.00, which is equal to 25 cents per share, which stock was later exchanged for shares of stock in Defendant Service Team;

    d. On May 25, 2011, Plaintiff Bethel purchased 110,000 shares of stock in Little Society, Inc. for $25,000.00, which is equal to 22.7 cents per share, which stock was later exchanged for shares of stock in Defendant Service Team;

    e. On or about October 11, 2011, Plaintiff Bethel purchased 100,000 shares of stock in Defendant Service Team for $25,000.00, which is equal to 25 cents per share;

    f. On or about October 14, 2011, Plaintiff Bethel purchased 40,000 shares of stock in Defendant Sport Stix for $10,000.00, which is equal to 25 cents per share;

    g. On or about January 21, 2012, Plaintiff Bethel purchased 30,000 shares of stock in Defendant Service Team for $15,000.00, which is equal to 50 cents per share;

    h. On or about August 18, 2012, Plaintiff Bethel purchased 30,000 shares of stock in Defendant Service Team for $7,500.00, which is equal to 25 cents per share;

    i. On or about the same date, being August 18, 2012, Plaintiff Bethel purchased 30,000 shares of stock in Defendant Sport Stix for $15,000, which is equal to 50 cents per share;

    j. On or about January 25, 2013, Plaintiff Bethel purchased 40,000 shares of stock

in Defendant Sport Stix for $10,000.00, which is equal to 20 cents per share;

k.   On or about January 30, 2013, certain loans Mr. and Mrs. Bethel made to Defendant Service Teams in the principal amount of $77,000.00, together with interest, were converted to 112,375 shares of stock in Defendant Service Team, which is more than 68 cents per share (the loans were made on or about the following dates in the following amounts: $15,000.00 on June 22, 2011; $27,000.00 on July 8, 2011; $12,500 on November 2, 2011; and $13,000.00 on May 26, 2011);

l.   On or about April 17, 2013, Plaintiff Bethel purchased 50,000 shares of stock in Defendant Sport Stix for $10,000.00, which is equal to 20 cents per share;

m.   On or about August 1, 2013, Plaintiff Bethel purchased 14,000 shares of stock in Defendant Service Team for $7,000, which is equal to 50 cents per share;

n.   On or about October 21, 2013, Plaintiff Bethel purchased 170,000 shares of stock in Sport Stix in three transactions in amounts according to proof; and

o.   On or about April 14, 2014, Plaintiff Bethel purchased 2,000 shares of stock in Defendant Service Team in exchange for making a loan to Defendant Hallmark in the amount of $5,000.

87.   Each Defendant acted with the intent to deceive, manipulate and defraud Plaintiff Bethel in making the aforesaid false statements. Each Defendant acted knowingly in making such statements. Each Defendant knew such statements were false at the time they were made or acted in reckless disregard of the truth or falsity such statements. Each Defendant intended such statements to induce Plaintiff Bethel to purchase the aforesaid stock. Each Defendant knew or should have known that such statements would harm, or were substantially likely to harm, Plaintiff Bethel.

88.   Plaintiff Bethel justifiably relied upon the aforesaid false representations and omissions in purchasing securities in that she did not know they were false or omitted, they were important to the transactions contemplated thereby and she would not have entered into such transactions had she

known the true facts. The Defendants perpetuated their fraudulent scheme by using misrepresentations to explain away losses and offering to repay such losses.

89. The Defendants used instrumentalities of interstate commerce, including mail, telephones, facsimile machines, email, the Internet, facilities of the Securities and Exchange Commission and facilities of one or more national security exchanges in connection with the purchase of securities. As alleged above, the Defendants explicitly used mail and email to make the aforesaid false representations, and the aforesaid omissions were omitted therefrom.

90. Each of the Defendants' misrepresentations and omissions caused Plaintiff Bethel to suffer damages in that she purchased stock for significantly more than its worth and is left only with stock of no value or nominal value.

91. Plaintiff Bethel received no dividend, return of capital or other value as a result of her purchase of said stocks.

## SECOND CAUSE OF ACTION
**(Financial Elder Abuse as to All Defendants)**

92. Plaintiff incorporates and realleges each of the foregoing allegations as though set forth herein in full.

93. Mr. and Mrs. Bethel were elders at the time of the earliest transaction alleged above.

94. Each of the Defendants took money from Plaintiff Bethel for a wrongful use or with intent to defraud, or both. Specifically, the Defendants took money in excess of the value of certain stock in exchange for such stock, as alleged above.

95. Each of the Defendants assisted in taking Money from Plaintiff Bethel a wrongful use or with intent to defraud, or both.

96. Each of the Defendants took money from Plaintiff Bethel by undue influence, as defined in California Welfare and Institutions Code Section 15610.70. Such undue influence was exercised by way of the statements alleged above.

97. Each Defendant knew or should have known that his or its conduct was likely to be harmful to Plaintiff Bethel at the time of such conduct, which conduct is alleged above.

98. In undertaking and carrying out such conduct, each Defendant acted with recklessness, oppression, fraud and malice.

## THIRD CAUSE OF ACTION
### (Section 20A Violations (Insider Trading) as to All Defendants)

99. Plaintiff incorporates and realleges each of the foregoing allegations as though set forth herein in full.

100. In each transaction alleged above, the selling Defendant sold securities while in possession of material, nonpublic information in violation of Chapter 15 of the United States Code, in particular Section 10(b) and Rule 10b-5, as alleged above.

## NO SAFE HARBOR

101. Plaintiff incorporates and realleges each of the foregoing allegations as though set forth herein in full.

102. The statutory "safe harbor" for forward-looking statements provided in Section 21E of the Exchange Act does not apply to the statements, acts and omissions alleged above because: (a) the statements were not identified or sufficiently identified as forward-looking statements; (b) they are not accompanied by meaningful cautionary statements; (c) the statements are material, as alleged above; and (d) the statements were made by persons with actual knowledge that they were false or misleading at the time the statements were made.

## TOLLING OF LIMITATIONS PERIOD

103. Plaintiff incorporates and realleges each of the foregoing allegations as though set forth herein in full.

104. By the acts and omissions alleged above, the Defendants actively concealed the true

facts and concealed their intentions.

105. Each act and omission alleged above is part of a single, continuous scheme to defraud Plaintiff Bethel. Each such act and omission constitutes a part of a single, continuous violation of the securities laws as alleged above.

106. In or about March of 2017, Defendant Cashman told Plaintiff Bethel that he "pay back" amounts owed to her on account of her purchases of stock. Because this was unusual and inconsistent with Defendant Cashman's prior representations, Plaintiff Bethel investigated the purchases alleged above. Thereafter, Plaintiff Bethel discovered that the statements alleged above were false and that the Defendants intended to defraud her.

107. During his lifetime, Mr. Bethel did not discover, and a reasonably diligent person in his circumstances would not have discovered, the true facts or the Defendants' intentions.

108. Mrs. Bethel did not discover, and a reasonably diligent person in her circumstances would not have discovered, the true facts or the Defendants' intentions until approximately March of 2017.

## BASIS OF ALLEGATIONS

109. Plaintiff incorporates and realleges each of the foregoing allegations as though set forth herein in full.

110. The facts and evidence relevant to the foregoing causes of action are particularly within the possession and control of the Defendants and not Plaintiff Bethel. Plaintiff Bethel alleges the foregoing based upon her lay investigation and the preliminary investigation of her counsel. Plaintiff Bethel believes that substantial additional evidentiary support for the allegations herein exists and will be revealed after a reasonable opportunity for discovery.

## JURY TRIAL DEMAND

111. Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bethel prays for entry of judgment in her favor and against all Defendants:

1. Pursuant to all causes of action, awarding compensatory damages in the sum of $276,500.00, or according to proof, together with prejudgment and postjudgment interest;

2. Pursuant to all causes of action, awarding general and special damages, according to proof;

3. Pursuant to the Second Cause of Action, awarding punitive damages, reasonable attorney's fees and costs of suit, according to proof;

4. Pursuant to the Third Cause of Action, awarding treble damages, reasonable attorney's fees and costs of suit, according to proof;

5. Pursuant to all causes of action, awarding costs of suit; and

6. Awarding such any other and further relief as is appropriate in the premises.

DATED: June 27, 2017                                  MACDONALD FERNANDEZ LLP

                                                      By: /s/ Reno F.R. Fernandez III
                                                          Reno F.R. Fernandez III
                                                          Attorneys for Plaintiff,
                                                          Penelope C. Bethel